In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-22-00385-CR

JIMMY DON LANE, Appellant

V.

THE STATE OF TEXAS, Appellee

**On Appeal from the 359th District Court**
**Montgomery County, Texas**
**Trial Cause No. 19-03-03501-CR**

## MEMORANDUM OPINION

A grand jury indicted Appellant Jimmy Don Lane for murder and alleged he "intentionally or knowingly cause[d] the death of . . . Tina Cappa, by shooting her with a firearm[.]" *See* Tex. Penal Code Ann. § 19.02. A jury found Appellant Jimmy Don Lane guilty as charged in the indictment and assessed Lane's punishment at life in prison. Lane conceded at trial that he pulled the trigger of the firearm, he shot Cappa, and he caused her death. The only issue at the guilt-innocence stage of the

trial was whether he acted intentionally or knowingly and not by accident. In four issues, Lane appeals his conviction. We affirm.

Evidence at Trial

Testimony of Deputy Ricardo Uresti

Deputy Ricardo Uresti with the Montgomery County Sheriff's Department testified he was dispatched on March 8, 2019, to "59 and Payne Road[]" in response to "an assault with a firearm." According to Deputy Uresti, the 9-1-1 call came in around 8:50 p.m. Deputy Uresti stated that based on the 9-1-1 call he and other law enforcement responded. They went to the marine shop at the location and used loud sirens and public announcement speakers for ten to fifteen minutes to get someone to answer, and dispatch attempted to call the person back but got no answer, so law enforcement left. Deputy Uresti testified that although the 9-1-1 call reported that someone had been shot and that someone had been stabbed, law enforcement left the premises after no response because law enforcement had received a call within the last three months at the same location where law enforcement responded to someone talking about someone being in the yard and no one was there and the caller was believed to be mentally ill. Deputy Uresti did not know at the time of the first 9-1-1 call that there was another residence nearby, and he believed Lane lived at the marine shop.

According to Deputy Uresti, another 9-1-1 call with the same location came in later that night at 10:15 p.m. When Uresti and law enforcement responded this time, they noticed a portion of the fence opened that was not opened the first time they responded, and Lane's son escorted them down the driveway to one of two trailers on the property. Deputy Uresti testified that Lane was sitting in a chair on the porch, and Uresti and another Deputy approached the porch and spoke with Lane. According to Deputy Uresti, Lane did not seem to want to talk to law enforcement, was mumbling, and said that he "had jumped someone." When Uresti asked Lane if the person he shot was still in the house, Lane answered, "well, yeah, I shot him." Lane gave them permission to do a security sweep of the residence, and when the other deputy entered the trailer, he shouted for Uresti to call EMS. Deputy Uresti testified that when he entered the trailer, there appeared to be blood on the walls and flesh and blood on the ceiling and floor, and a small-framed female was lying face down in the kitchen area with massive trauma to her face. According to Deputy Uresti, he was told that someone had tried to break in, but he noticed that the injured female was wearing socks and had slippers nearby and there was no dirt on the socks and no "outside shoes" nearby. Deputy Uresti testified that there was a shotgun on the floor near the body, the deputies noted where everything was in the trailer, they were shocked at what they saw, and then they backed out of the trailer to talk to Lane without doing a complete sweep of the residence to clear the scene. According to

3

Uresti, Lane was "sporadic" and agitated, and when Deputy Uresti brought up that it looked like the victim lived there because the victim was wearing socks, Lane stopped talking and said, "I plead the Fifth." Deputy Uresti testified that when he mentioned to Lane that law enforcement had been dispatched to the property earlier that night but that no one had answered, Lane did not give an answer why he had not answered.

Deputy Uresti testified that when he was on the scene, he had his COBAN dash video surveillance and a microphone on his belt activated, and the recording was admitted into evidence without objection and played for the jury. Photographs of the scene were also admitted at trial and published to the jury.

Deputy Uresti testified that in the video Lane can be heard stating that he did not know the person in the house and that he had been threatened. According to Uresti, Lane "kept saying he was being threatened." Deputy Uresti read Lane his *Miranda* rights. Deputy Uresti continued to stay with Lane while EMS tended to the victim. Deputy Uresti testified that although Lane had mentioned in the first 9-1-1 call that night that he had been stabbed, he never reported to Uresti that he had been stabbed. When law enforcement asked if they could go back in the trailer to search, Lane would not consent to the search. According to Deputy Uresti, detectives secured a search warrant. Deputy Uresti put bags on Lane's hands to preserve any gunshot residue, and although Lane was being detained for investigative purposes

4

and not free to leave, he was not under arrest. According to Deputy Uresti, at no time that night did he see Lane handcuffed. Deputy Uresti testified that Lane was taken by ambulance to the hospital and later that night Lane was arrested. Recordings of the two 9-1-1 calls on the night of the shooting were admitted into evidence and played for the jury.

Testimony of Julie Cunningham

Julie Cunningham testified that she was working as an ambulance paramedic on the night of the shooting, and she and her partner were dispatched to the scene. According to Cunningham, they had to wait for law enforcement to let them know when it was safe to approach, they walked up to the trailer with their medical gear, and law enforcement advised them that there was someone inside and a man on the porch. Cunningham testified that the man on the porch said he was okay and was not in need of medical attention. Cunningham testified that once in the trailer, she observed a female lying on the floor with an obvious gunshot wound and the female was clearly deceased because "[t]here was no head[] [and] brain matter everywhere." According to Cunningham, when she later spoke to the man on the porch named "Jimmy," whom she identified as defendant Lane at trial, he was "very evasive with [the paramedics'] questioning[,]" and did not want to provide them his full name. Cunningham testified that Lane had wet hair, clean clothes except for socks that were bloody on the bottom, and he appeared to have recently showered. When

5

Cunningham questioned Lane about whether he had recently taken a shower, Lane initially answered that he had not, but a few seconds later he said that he had. Cunningham questioned Lane about what had happened inside the trailer, and initially Lane said that he did not know, but then told her he shot an intruder. According to Cunningham, after she talked to Lane about other things and then questioned him again about the person inside the trailer, Lane told Cunningham the female's first name but then said he did not know her and that she did not live there. Cunningham testified that when she asked Lane if she looked in the mailbox would there be mail addressed to the woman in the trailer, Lane said, "well, yeah, maybe she does live here." Lane did not discuss the events leading up to the female's death and never said anything to her about being afraid for his safety. According to Cunningham, Lane admitted to drinking that night, and Cunningham noted that his speech was slurred, but she did not know at the time whether that was due to alcohol or if he normally talked that way. Lane denied suffering from any mental health issues, but later reported he was having anxiety. Reports made by Cunningham and the other paramedic at the scene that night were admitted as evidence at trial. Cunningham testified that one of the reports states that Lane told the paramedics he did not know the deceased's name but thought it might be "Tina Bell" and then also told them that she had lived in the residence with Lane for two years. According to Cunningham, the other report states that Lane had no observable bruising or

6

scratches or broken bones but that he was complaining that he was afraid he was having an "anxiety attack." Cunningham testified that one of the reports states that Lane had admitted "to drinking a half pint of alcohol" that day, and he asked if he needed a lawyer. Cunningham testified that because Lane could not answer two of four questions relating to whether he was oriented, EMS was required for liability reasons to transport him to the hospital even if he did not want to be taken to the hospital. Cunningham testified that she ultimately transported Lane from the emergency room to Memorial Hermann Northeast Hospital because "[h]e wanted to get out of Montgomery County[]" and he "was afraid he was going to have an anxiety attack."

Testimony of Kirk Powell

Kirk Powell testified that on the night of the shooting, he was working as an emergency room technician at Memorial Hermann Northeast, and that when Lane arrived at the EMS bay, Lane was belligerent and yelling things that did not make sense, so Powell was "assigned to him after that." According to Powell, he was tasked with doing Lane's blood work and making sure he stayed in the room and that the room "was safe and everybody else was safe." According to Powell, Lane did not appear to have any injuries but appeared intoxicated based on "[h]is mode of speaking, repetition, and things he was saying[,] [a]nd you could smell it a little bit and just by his actions overall."

7

Powell testified that while Lane was being evaluated and his blood drawn, Powell was conversing with Lane and at one point their conversation started being recorded. Powell testified that law enforcement did not ask him to ask Lane questions and that he converses with ER patients "to be a part of their care and be a part of their resolution to get discharged or be further evaluated." According to Powell, he believed that one of the officers recorded the conversation, police officers and a nurse were coming in and out of the ER room, and that although there were some police officer interactions recorded in the conversation, the recorded conversation was mostly a conversation between Powell and Lane. Powell testified that at the time of the conversation, Lane had calmed down compared to his demeanor when he arrived at the hospital, and that once Lane was in the room "he was a whole different person." A copy of the audio recording of the conversation was admitted at trial without objection and played for the jury. Powell testified that in the recording Lane made clear that he knew the person that he shot in his home that night, and he denied that there was any kind of physical altercation. A transcript of the audio recorded conversation was admitted as evidence at trial without objection. In the recorded conversation, Lane can be heard telling Powell that he acted out of fear because he and Cappa were arguing that night and it "just went south[,]" he had been threatened by Cappa and her son, and he did not want to get beaten up again by Cappa's son because her son beat him up before.

<u>Testimony of Carlo Santini, Sr.</u>

Cappa's son, Carlo Santini, Sr. (hereinafter "Carlo"), testified that at the time of trial he was incarcerated for failing to register as a sex offender. According to Carlo, in 2019, he lived with his son, his mother Tina Cappa, and Lane in Lane's trailer. Carlo testified that his mother was a friend and co-worker of Lane's and that she did paperwork for Lane's business where Carlo also worked as a boat mechanic.

According to Carlo, on the day of the shooting, he arrived at work that day around noon and Lane was drinking and working. Carlo testified that around 5 or 6 p.m., his girlfriend Della Dean and her friend Tammy sat in the shop with him while he closed the shop. Carlo testified that it was payday and he and Lane argued about why Lane was not paying him. Carlo testified that during the argument, he told Lane, "Get my money or they're going to beat your a#@ if you keep playing with me[,]" but did not threaten him with any weapons. Carlo testified he saw Lane leave with Cappa, and Carlo believed Lane was taking Cappa to get coffee and was going to get the money to pay Carlo. Carlo testified he stayed at the shop until they got back, and when they returned, he closed the shop, went to Lane's trailer to introduce Dean to his mother, his mother seemed aggravated, he realized he left one of his belongings at the shop, he asked Lane for the keys to the shop, and "that's when everything went south." According to Carlo, he and Lane argued but "[n]obody hit nobody[]" and Cappa asked Carlo to leave. Carlo testified that his mother came out

9

of the trailer and handed him $50 cash, he was still mad because he was owed more money, and his mother told him to leave for the night and that she would "take care of it." Carlo testified they left around 7:00 or 7:30 p.m. and spent the night at one of Dean's friend's house.

Carlo testified that Lane drinks daily and gets very aggressive when he drinks and "starts talking crazy to you." According to Carlo, his mother and Lane argued frequently about "[m]oney and drinking[,]" and the arguments would get heated. Carlo testified that Lane owed Cappa money and that she had found something with Lane's tax returns "not being added up right[,]" and that she had told him she did not want to be involved because it was illegal and that if he did not give her the money he owed her by a certain time that she would "turn [him] in."

Carlo testified that he got into a fight with Lane on two occasions, one was "play fighting[]" and wrestling at the shop and Lane got upset and wanted to fight, and Lane punched Carlo when Carlo was on the phone and Carlo beat him up. On the second incident, Carlo and Lane were "slap boxing[]" and Lane was "playing around [and] slap[ped] [Carlo] in the face[,]" and Carlo "swung back and caught him in his eye." Carlo testified that he was convicted of a state jail felony theft in 2002, robbery in 2002, sexual assault of a child[1] in 2004 and placed on deferred probation.

---

[1] The victim was Carlo's girlfriend at that time, and he got her pregnant when she was sixteen and Carlo was twenty-three. Carlo claimed she allegedly told him

10

After Lane killed his mother, Carlos's probation was revoked, and he was incarcerated for failing to register as a sex offender. When he testified at Lane's trial, Carlo was serving an eight-year sentence on the conviction resulting from his violation of his probation on his conviction for sexually assaulting a child.

Testimony of Carlo Santini, Jr.

Sixteen-year-old Carlo Santini, Jr. (hereinafter "Junior") testified that when he was approximately twelve years old, he lived with his grandmother Tina Cappa, his father "Carlo," and Lane in Lane's trailer in New Caney. According to Junior, Cappa was not in a romantic relationship with Lane, and Cappa and Carlo worked for Lane at Lane's boat repair shop located on the same property as Lane's trailer. Junior testified that Cappa did the bookkeeping for Lane's boat repair business. According to Junior, in the two months prior to Cappa's death, he heard Cappa and Lane arguing about three times a week, and the arguments were related to Cappa accusing Lane of not paying Cappa and Carlo enough for their work at the boat repair shop and Cappa threatening to report Lane's "tax fraud" to law enforcement. Junior testified that Lane kept firearms in the trailer and that Lane consumed whiskey "[m]ostly every day[]" and Lane would often get mad at everyone who lived at the trailer when he drank alcohol. According to Junior, on one occasion Carlo and Lane

---

that she was nineteen, and he testified she was his "first wife" and the mother of his son.

were having fun wrestling and Carlo "won the play fight[]" and Lane was drunk and got mad and told Carlo "let's go finish it outside like men." Junior testified that Cappa told Carlo to leave, and that Carlo left. Junior testified that he could not remember ever seeing Lane and Carlo hit each other, and he did not remember ever seeing Carlo threaten Lane with a weapon. According to Junior, Cappa did not want to live with Lane much longer.

Junior testified that he was not at the trailer but was spending the night with a friend on the night that Cappa was killed. According to Junior, that day Cappa and Lane were working at the boat repair shop, and Carlo and his girlfriend were "hanging out" in the car. Junior testified that when he left for his friend's house that day, he thought that Carlo had already left the boat repair shop.

Testimony of Della Dean

Della Dean testified that she met Carlo on February 25, 2019, and that by March 2019, she and Carlo were "heading into an actual relationship." According to Dean, on March 8, 2019, she dropped Carlo off at work at the boat repair shop around noon and came back to pick him up around 6 p.m. Dean testified that when she and her friend Tammy arrived to pick him up, Carlo was standing outside of Lane's vehicle and Lane was driving off, they were arguing about money, and the argument was escalating. Dean testified that Carlo "just want[ed] his money[,]" and that "[h]e said it happened every time on payday that he wouldn't get his money." According

12

to Dean, Lane drove off and Dean pulled up to the shop to retrieve some shoes she had left at the shop, and when she got out of her car, she saw Carlo walking back and forth between the shop and the trailer on the same property. Dean testified that Carlo prompted her to go to the trailer so she could meet his mother.

Dean testified that when she entered the trailer, the atmosphere "was very tense[,]" Lane was sitting at the table and appeared intoxicated, and Cappa was sitting opposite from Lane at the table with an agitated look on her face. According to Dean, this was the first time she met Lane or Cappa. Dean said she saw a firearm on the table near Lane, which Dean stated she believed to be a pistol, along with beer cans and bottles of pills. Dean testified that she was in the trailer for about fifteen minutes, from about 6:30 to 6:45 p.m. After Carlo introduced her to his mother, Dean got back in her truck and waited for Carlo, Carlo then came out of the trailer yelling about wanting his money, and Cappa told him to get in the truck and that she would go get his money. According to Dean, Cappa "ended up finally giving him the money and then told him to just leave with [Dean] and not to come back until tomorrow." They left shortly before 7:30 p.m.

On cross-examination, Dean agreed that State's Exhibit 16, which was admitted into evidence, is a photo of the table that was taken later that night by law enforcement and that it shows pill bottles on the table but that no beer cans or a pistol

13

are visible in the photo. Dean agreed that a nearby trashcan that is also visible in the photo does did not appear to contain any empty beer cans.

Testimony of Dr. Sara Doyle

Dr. Sara Doyle, a forensic pathologist for Montgomery County, testified that she performed Cappa's autopsy on March 11, 2019, and the autopsy report was admitted into evidence at trial. According to Dr. Doyle, Cappa suffered "multiple shotgun pellet defects involving predominantly her head[] [a]nd also focally her neck and upper torso area[,] [a]nd this included a large area of destruction of her face from a shotgun wound." Dr. Doyle testified that in addition to other "satellite pellet wounds," "the front and the right side of her skull [were] missing[]" and "everything above the brainstem cerebellum had been extruded from her cranial cavity by the shotgun charge." In Dr. Doyle's expert opinion, she believed that the firearm was fired between five and ten feet from Cappa's face. She concluded that Cappa's manner of death was homicide and that her cause of death was the shotgun wounds to her head. According to Dr. Doyle, a toxicology report attached to the autopsy report showed that, at the time of Cappa's death, she did not have alcohol or any "major drugs of abuse[]" in her system.

Testimony of Brent Allen

Brent Allen testified that in 2013 he worked as a mechanic for Lane's boat repair shop for about six months. According to Allen, during that time he and Lane

14

had an argument because Lane did not pay him, Lane pointed a handgun at Allen's head, and Lane told Allen to leave the shop. Allen testified he left the shop and called the police.

Testimony of Lane's Ex-Wife

Lane's ex-wife testified that she and Lane were married for over twenty years and that during that time she did the bookkeeping for the boat repair shop, and that after they divorced, she continued to work there because she owned half the business, and she was helping him recover from a brain aneurysm. Lane's ex-wife testified that they always argued, and she left Lane around 2013. According to Lane's ex-wife, she was afraid to testify and that while she was living with Lane, he owned many guns and was an avid hunter. Lane's ex-wife testified that Lane taught her about gun safety, to never point a gun at someone, and when holding a gun to point it down to avoid an accident.

Lane's ex-wife testified that on December 2, 2013, which was after she left Lane and was living in another county, she received a phone call from Lane, they argued, and "he threatened [her] and said he would blow [her] horse - - [her] and [her] horses' head[s] off." According to Lane's ex-wife, when Lane made that threat, she was scared because she "didn't know if he really would." On cross-examination, Lane's ex-wife testified that Lane had never pointed a gun at her.

Testimony of Celestina Rossi

Celestina Rossi, a sergeant with the Montgomery County Sheriff's Office Crime Scene Unit, testified that on the night of the shooting, she was the on-call crime scene investigator and was called to respond to the scene. After learning that police were planning to obtain a search warrant to search the residence, Sergeant Rossi went to Memorial Hermann Northeast Hospital, where she spoke with Lane. The evidence she collected at the hospital included two hand preservation bags police had placed on Lane's hands at the scene to preserve evidence, a gunshot residue kit, and a bag of clothing.

According to Rossi, she returned to Lane's residence at 2:03 a.m., and at that point police had obtained the search warrants for Lane's residence and his business. Rossi testified that she took crime scene photographs at the residence, and photographs that she took were admitted into evidence during the trial. From some of the photographs, Sergeant Rossi explained the position of Cappa's body and position of the components of a shotgun shell casing, which was nearby. Sergeant Rossi testified in detail as to the patterns of blood in the photos, and she also testified about what she thought the bloodstain patterns revealed. Sergeant Rossi testified that, based on her training and experience in analyzing bloodstain patterns and the evidence in the case, she believed the gun was fired from the kitchen toward the living room, that Cappa's feet were not in the nearby slippers when she was shot,

16

and that, based on the absence of blood in some of the bloodstained areas as well as the blood drip patterns, Cappa was shot while sitting on a chair with her arm resting on the table. According to Rossi, the angle of the shot was "[f]ront to back[]" and to the right side of Cappa's face, and the impact from the gunshot resulted in Cappa losing the "whole top of her head." Sergeant Rossi testified that one fired shotgun shell casing was located at the threshold from the primary bedroom, another fired shotgun shell casing was found in the kitchen, and a live round was still in the shotgun. Based on the evidence at the scene, Rossi testified that she believed that "a fired round that had been ejected in the bedroom, which loaded a live round, and that the live round was fired. And then that . . . spent round was ejected into the kitchen and another live round was loaded and that was the condition we found it in." Rossi agreed that after Lane shot Cappa with the shotgun, he loaded another live round into the chamber. Rossi testified that based on her bloodstain pattern analysis, it was her expert opinion that when Cappa was shot, her head tilted back, causing blood to drip from her head down on the floor, and that once the blood on the floor dried, Cappa "was transitioned from this position out of the chair[]" to face down on the floor. According to Sergeant Rossi, Cappa could not have moved out of the chair to the floor on her own accord because the chair would have tipped over with her "[a]nd the chair was upright in place without [] any movement of the chair wheels through the blood." Sergeant Rossi testified that a human body's center weight of gravity is

17

usually in the trunk of the body and "just because the head is impacted doesn't mean she's going to be thrust out of the chair and onto the ground." Sergeant Rossi concluded that Cappa "was in place, the spatters in and around the chair had time to dry before [Cappa] was then placed in her photograph[ed] position." According to Sergeant Rossi, blood spatter on a linoleum floor dries "pretty quickly" and "doesn't take hours and hours to dry." At trial, Sergeant Rossi also read Lane's stipulation that indicates Cappa's blood and DNA were on the clothing Lane was wearing when police found him at the scene.

Testimony of John-William Knight

John-William Knight, a forensic scientist with the Texas Department of Public Safety who specializes in firearms, testified that he was tasked in this case with testing a shotgun, and he identified in his report the shotgun that he had tested was a Winchester Defender 12-gauge and was the same shotgun that was admitted as evidence at trial. Knight testified that the "trigger pull" of the shotgun measured about five-and-a-half to six pounds. According to Knight, based on his examination of the shotgun and after firing it three times, he determined that the firearm was fully functional, and another analyst tested the firearm and confirmed that determination. A copy of Knight's report documenting his findings was admitted into evidence.

<u>Testimony of the Defendant</u>

According to Lane, he met Cappa through a dating website, she began working for him at the boat shop, and she ultimately moved into his trailer with him but had her own room because they were no longer dating. Her grandson lived there, and at times her son, Carlo, also lived with them in the trailer. Lane testified that Carlo needed a place to live and "an established residence[]" to register as a sex offender when he got out of jail. Lane explained that he paid Carlo for the work that he did at the shop as a mechanic.

Lane testified that on the day of the shooting, Carlo arrived late to work and then that night asked Lane for money. Lane said he gave Carlo $50. Lane claimed that because Carlo wanted more money, they argued, but then Carlo left with his girlfriend. Lane testified that after Carlo left, he and Cappa watched television, they talked about money he owed her, but then the discussion "went away and was settled." Lane told the jury that the discussion was not an "argument" and that it never turned physical.

According to Lane, he and Cappa were eating and watching television and he was drinking whiskey. Lane testified that he and Cappa heard people talking between the trailer and the boat shop where people had previously cut the fence, accessed the property, and stolen items from the shop, so he got his shotgun from his bedroom. Lane testified that Cappa was standing waiting to go with him outside.

19

Lane testified that when he was walking back from the bedroom with his loaded shotgun over his shoulder, and right before he got to the table, he tripped over something, his finger went into the trigger, the gun discharged and shot Cappa, and when she fell, she ended up in the location in which she is seen in the photographs the State took at the scene. According to Lane, he set the gun down, went around and kneeled and touched Cappa's back, but she was not breathing. After that, Lane testified that he got the shotgun, put another shell in it, and went back out on the porch to see if he saw anyone there. Lane testified that while on the porch, he "racked" the shotgun, put a live round in, but did not see anyone, so he went back inside. Lane claimed that although he was in shock, he set the shot gun down on the floor and called 9-1-1. Lane testified that he also called his son, told him something bad had happened, and asked him to come over before calling 9-1-1 for a second time. Lane testified that he never saw flashing lights until he saw law enforcement officers approaching the trailer with his son.

Lane testified that he sat on the porch in a chair while law enforcement officers went into his trailer. He testified that he left the scene in an ambulance, but that he could not remember the drive to the hospital or telling anyone at the hospital what happened. According to Lane, after spending the night at the hospital, the police arrested him the next day and took him to jail.

At trial, Lane testified he did not intend to shoot Cappa, the shooting was accidental, and Cappa never threatened him that night. Lane told the jury that he did not know whether the safety was on when he picked up the shotgun from his bedroom, and if the safety was on, he would have had to take the safety off for the shotgun to have fired. Lane also said that he did not take a shower that night after shooting Cappa, and he said when police arrived at the scene, his hair was wet because he was sweaty and nervous. Lane also denied moving Cappa's body, and he testified that he did not take her out of the chair and then move her to the ground. He testified that State's Exhibit 14, a photograph admitted at trial depicting blood droplets around Cappa's body where it was found, does not show any blood smeared across the floor.

Lane testified that he "may owe the IRS some money," but that his bookkeeper was still trying to get "everything straightened out and [the] corporation closed down." As for the threat against his ex-wife, Lane denied making the threat but agreed that the divorce was "[v]ery nasty[]" and that his ex-wife "kept stealing from the corporation." Lane admitted that in 2015 he pled guilty to the felony offense of retaliation based on threatening to shoot his wife, but he claimed that he pleaded guilty on the advice of his attorney. Lane testified that he suffered a brain aneurysm in 2011, which required surgery. According to Lane, after the aneurysm, he became more irritable and lost strength.

21

Lane was also asked about his experience with firearms. Lane testified that he has handled firearms for over forty years, and that he had owned the shotgun that killed Cappa for around thirty years. Lane admitted that in his first 9-1-1 call that night, he may have said that he shot an intruder, but if that is what he said, then he lied about what happened to 9-1-1. Lane also testified when he was at the hospital, he did not remember telling Powell that Cappa's son had beaten Lane up or that Cappa had threatened Lane. Lane denied telling Powell that Cappa was threatening him the night she was killed.

Testimony of Fred Wetz

Fred Wetz testified for the defense. Wetz testified that he has been in the insurance business for 47 years and is an elected official. According to Wetz, he has done business with Lane's boat shop and continues to do business with him and has known Lane for close to 50 years. Wetz testified that in the community Lane is talked about positively, Wetz considers Lane to be dependable, he has never seen Lane drink alcohol, and he has never heard that Lane had a reputation for violence.

Testimony on Re-Direct of Celestina Rossi

On re-direct, Sergeant Rossi testified in the following exchange as to why she found Lane's explanation of how Cappa was shot "ludicrous" and how certain photographs from the scene supported her conclusion.

> [Prosecutor:] What based on the crime scene and bloodstain pattern evidence makes you think that his explanation is ludicrous?

[Sergeant Rossi:] The first explanation of - - that he was carrying the gun out of the bedroom and tripped when there was nothing in the path from the bedroom to the kitchen to trip over. The way that he was reportedly carrying the shotgun, and that if he was in a falling motion, that when the gun was level, that somehow it fired into the head of Tina Cappa does not make sense just based on - - on gravity and balance.

[Prosecutor:] Would you - - would you be willing to demonstrate why you say that?

[Sergeant Rossi:] Yes, sir.

[Prosecutor:] Okay. . . . May she step down?

THE COURT: Yes.

[Sergeant Rossi:] If I am carrying the weapon - - and I'm left-handed. So, if I'm carrying the shotgun and something happens and I trip, the gun is going to stay because it's a counterbalance. So, I am - - as I go down, either the gun's going to come down to balance, which doesn't make sense because you usually put - - you're going to fall and you're going - - the gun is going to stay balanced. So, in order for the gun to be like this and somehow get to this while firing while you're falling does not - - does not make sense. It just defies gravity on - - if you're going to fall, it's going to shoot into the ceiling. It's not going to shoot straight across.

[Prosecutor:] Now, turning to - - turning to Mr. Lane's explanation that Tina Cappa was standing at the time he shot her.
[Sergeant Rossi:] That also does not make sense because of the void patterns on the chair. There is no additional voids in the bloodstains. And so, if Tina Cappa was standing on the floor when the event occurred, then she is going to have to move through the blood that is being deposited and there is no disruption of the blood or the spatters on the floor. And so, there is no movement.

. . . .

[Prosecutor:] What about [State's Exhibit 64A] shows why Mr. Lane's story is ludicrous?

23

[Sergeant Rossi:] Because there is spatters in her slippers - - on the footbed of her slippers, as well as on the tops of her slippers. And that is the only thing there that - - so, she's not in her slippers because the blood is deposited onto the slippers. And there is no other place in the blood that create - - could create a void for her to end up in the position that she's in.

[Prosecutor:] What - - now, we're looking at State's Exhibit 66A. What about State's Exhibit 66A shows that Mr. Lane's story is ludicrous?

[Sergeant Rossi:] Because there is just the corner of the pillow that has bloodstains on it and the rest of the pillow is void of blood.

[Prosecutor:] Showing what?

[Sergeant Rossi:] That something was blocking that area.

[Prosecutor:] Okay. And as well as the markings on the table?

[Sergeant Rossi:] Correct.

[Prosecutor:] Okay. Is it fair to say that this bloodstain pattern indicates that the victim was sitting at the time she was shot?

[Sergeant Rossi:] Correct. And there's also no blood on the seatback either. So, not only is her - - her butt in the chair, but her back is against the backrest. There's blood on top of the chair, but there's no blood in the chair.
[Prosecutor:] And we're now looking at State's Exhibit 31. What about State's Exhibit 31 shows that the defendant's story is ludicrous?

[Sergeant Rossi:] Because the blood from her head has to drip into a pool in order to create the spatters that are up underneath the - - the cabinet, as well as all of the varying directionalities of the spatters. And that is caused from a drip pattern. In order to get a drip pattern, that blood has to drip from a distance. It cannot occur from being in the position that she's in.

[Prosecutor:] Okay. What does this bloodstain pattern - - or what does this blood spatter tell you about the position of Tina Cappa's head after she was shot?

[Sergeant Rossi:] That it was still up - - it was still up in the chair.

[Prosecutor:] Did you hear the testimony about him - - about her falling and ending up in the position that she's in, in the pictures that we have shown to the jury?

[Sergeant Rossi:] I did.

[Prosecutor:] What do you think about that?

[Sergeant Rossi:] I think that Mr. Lane is - - this is another one of Mr. Lane's stories that - - bodies don't - - aren't standing up and end up in the position that she's in. . . . Not with a projectory [sic] of the injury that she sustained.

[Prosecutor:] What about the story that he immediately went over to her and checked on her?

[Sergeant Rossi:] That is also not supported by the evidence because, No. 1, there is no disruption in the staining. [Defense counsel] asked him to look at the picture and admit that there was no smearing in the bloodstaining. And in the photographs taken of him, from patrol officers at the scene when they first got there, there is no blood on his knees. There is no blood on his shins. There's no blood on his hands. And so, there - - by Mr. Lane's testimony that he knelt down beside her and checked on her, there is no evidence to support that claim.

On cross-examination, when Sergeant Rossi was asked if it was plausible that the blast to Cappa's face could have spun her around and dropped her, Rossi testified that in her twenty years of crime scene experience she has never seen a body end up in that position after a gunshot blast to the face. Sergeant Rossi testified that her conclusion is that if Cappa "succumbed to falling out of the chair based on gravity,

25

she would be in clump on the floor with the chair tipped over[,]" and that "the only other explanation for her position is that she was moved after the blood was dry and the only person in that house was Mr. Lane."

## Issues on Appeal

In Lane's first issue, he argues he received ineffective assistance of counsel because his counsel failed to file a motion to suppress audio recorded statements "when the statement was obtained in clear violation of Texas Code of Criminal Procedure Article 38.22[.]" In issues two and three, he argues the trial court erred when, over Lane's objections under Texas Rule of Evidence 404(b), it admitted testimony detailing Appellant's prior threats to his ex-wife and former employee. In issue four, Lane argues that in the aggregate, the errors asserted in his first three issues caused him cumulative harm that entitle him to a new trial.

## Allegations of Ineffective Assistance of Counsel

In his first issue, Lane argues his attorney was deficient for failing to file a motion to suppress the COBAN audio recording police obtained at the scene (State's Exhibit 19) and the recording and transcript of the recording of Lane speaking with medical personnel at the hospital (State's Exhibits 22 and 23). Lane argues his statements within these exhibits were used by the State to show Lane acted with intent when he discharged the shotgun and to show that statements he made in the recordings are inconsistent with his trial testimony. Lane argues these exhibits

contain incriminating statements that police obtained illegally because they were the product of custodial interrogation,[2] and for that reason the statements in the recordings are not admissible under article 38.22 of the Texas Code of Criminal Procedure because the recordings do not show that he properly waived his statutory rights and they do not properly identify the persons whose voices are captured in the recordings. According to Lane, his counsel was deficient in not filing motions to suppress these exhibits, and Lane argues that if his attorney had sought to suppress these statements by filing appropriate motions, he would not have been convicted.

Both the United States Constitution and the Texas Constitution guarantee an accused the right to assistance of counsel. U.S. Const. amend. VI; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 1.051. This right necessarily includes the right to reasonably effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Ex parte Gonzales*, 945 S.W.2d 830, 835 (Tex. Crim. App. 1997). With respect to an ineffective assistance claim, our review of counsel's performance is highly deferential, and there is a strong presumption that counsel's performance fell within the wide range of reasonably professional assistance. *Strickland*, 446 U.S. at 689; *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011) (citing

---

[2] As for Lane's statements to medical personnel at the hospital, Lane argues that Kirk Powell was an "agent" of the Montgomery County Sheriff's Office, and therefore, the standards of article 38.22 apply to the recorded statement police obtained using their agent, Powell.

27

*Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006)). To overcome that presumption, Appellant must satisfy the two prongs established by *Strickland v. Washington* by demonstrating that (1) counsel's representations fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense. *Lopez*, 343 S.W.3d at 142 (citing *Strickland*, 466 U.S. at 687); *see also Hernandez v. State*, 726 S.W.2d 53, 55-57 (Tex. Crim. App. 1986) (adopting and applying the *Strickland* test). "Unless [an] appellant can prove both prongs, an appellate court must not find counsel's representation to be ineffective." *Lopez*, 343 S.W.3d at 142 (citing *Strickland*, 466 U.S. at 687). The record must contain evidence of counsel's reasoning or lack thereof, to rebut that presumption. *Ortiz v. State*, 93 S.W.3d 79, 88-89 (Tex. Crim. App. 2002) ("If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal."). "When such direct evidence is not available, we will assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined." *Lopez*, 343 S.W.3d at 143 (citing *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

"An appellate court looks to the totality of the representation and the particular circumstances of each case in evaluating the effectiveness of counsel." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing *Ex parte Felton*, 815

28

S.W.2d 733, 735 (Tex. Crim. App. 1991)). Allegations of ineffectiveness must be shown in the record, and the record must affirmatively establish the alleged ineffectiveness. *See id.* Ordinarily, on direct appeal, the record will not have been sufficiently developed during the trial regarding trial counsel's alleged errors to demonstrate in the appeal that trial counsel provided ineffective assistance under the *Strickland* standards. *Menefield v. State*, 363 S.W.3d 591, 592-93 (Tex. Crim. App. 2012); *Lopez*, 343 S.W.3d at 143. Before we denounce trial counsel's actions as ineffective, counsel should normally be given an opportunity to explain the challenged actions. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). When counsel has not been given an opportunity to explain the challenged actions, we will find deficient performance only if the conduct was "so outrageous that no competent attorney would have engaged in it." *Id.*

"To show prejudice, 'the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994) (quoting *Strickland*, 466 U.S. at 694).

Appellant filed a motion for new trial. However, the motion for new trial did not allege ineffective assistance of counsel, and no hearing on the motion was held. Accordingly, trial counsel has not had an opportunity to explain his trial strategy in

29

response to the matters Appellant now contends were deficient. *See Menefield*, 363 S.W.3d at 593.

A trial counsel's failure to file a motion to suppress is not per se ineffective assistance of counsel. *Land v. State*, 890 S.W.2d 229, 233 (Tex. App.—Beaumont 1994, no pet.) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986)). To prove ineffective assistance of counsel for failing to move to suppress evidence, an appellant is required to show that the motion to suppress would have been granted and that the remaining evidence would have been insufficient to support his conviction. *See Jackson v. State*, 973 S.W.2d 954, 956-57 (Tex. Crim. App. 1998); *see also Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) (counsel need not engage in the filing of futile motions).

Lane has failed to show that a motion to suppress the recordings and statements would have been granted. As for the COBAN recording, Deputy Uresti testified that when police obtained the recording, Lane was being detained for investigative purposes, he was not free to leave, but he was not under arrest, and he was not in handcuffs. Because a fact issue exists over whether the statements were the result of a custodial interrogation, had a motion to suppress the COBAN recording been filed, we cannot say the trial court would have granted the motion because the trial court could have reasonably concluded that the noncoercive and investigative on-the-scene questioning of Lane did not rise to the level of "custodial

interrogation" for purposes of article 38.22. Thus, even if a motion to suppress had been filed, the trial court in resolving the issues of fact could have found the recording admissible. *See Mutz v. State*, 862 S.W.2d 24, 26-28 (Tex. App.—Beaumont 1993, pet. ref'd) (where appellant was detained in a noncoercive manner by responding law enforcement outside of a trailer where a shooting and death had occurred inside, even if appellant was not free to leave and questioned in an investigative manner regarding the shooting, it did not constitute "custodial interrogation" for article 38.22 purposes) (citing *Miranda v. Arizona*, 384 U.S. 436, 477-78 (1966); *Amores v. State*, 816 S.W.2d 407, 411-12 (Tex. Crim. App. 1991)).

As for a motion to suppress the recording from the hospital, we also cannot say a motion to suppress would have been granted. Based on the testimony of Cunningham, the EMS paramedic, Lane was being transported to the hospital for medical treatment when that statement was obtained. The trial court could have reasonably concluded that any physical deprivation of Lane's freedom while he was being treated related to his medical treatment and not the actions of law enforcement. *See Redmond v. State*, 30 S.W.3d 692, 696-97 (Tex. App.—Beaumont 2000, pet. ref'd) (physical restrictions due to injuries and medical treatment did not constitute custody). Lane testified after the night he was treated at the hospital he was later arrested. On this record, we cannot say the trial court erred in concluding the facts do not constitute custody under article 38.22. *See Martinez v. State*, 496 S.W.3d 215,

219-20 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (citing *Redmond*, 30 S.W.3d at 696-97). Also, we conclude the evidence does not support Lane's argument that Powell was acting as an agent of the Montgomery County Sheriff's Office when Lane was questioned by Powell. In fact, Powell testified that law enforcement did not ask him to ask Lane questions, and Powell explained that he converses with ER patients "to be a part of their care and be a part of their resolution to get discharged or be further evaluated."

Additionally, Lane has failed to demonstrate that the remaining evidence would have been insufficient to support his conviction. The jury heard Lane testify that on the day of the shooting, he and Carlo argued about money and that Lane and Cappa discussed that he owed her money. The jury heard Lane testify that his finger was not on the trigger and his finger must have hit the shotgun trigger when he tripped, and the jury also heard Knight, the forensic scientist who specializes in firearms, testify that the gun was fully functional and had a trigger pull of five-and-a-half to six pounds. The jury heard Carlo's testimony that (1) Cappa and Lane argued that day about money and that Lane owed Cappa money; (2) Junior's testimony that in the two months prior to the shooting, Lane and Cappa fought about Lane not paying her; and (3) both Carlo's and Junior's testimony that Cappa had threatened to report Lane for tax fraud. The jury heard Dean testify that Lane had been drinking on the day of the shooting and that the atmosphere in the trailer was

"very tense." The jury also heard Lane testify that he had been drinking alcohol right before the shooting. Additionally, the jury heard Sergeant Rossi's testimony that in her expert opinion, Cappa was sitting when Lane shot her and that after shooting her, Lane moved Cappa's body to the floor. The jury also heard the reasons that Sergeant Rossi thought Lane's claim that the shooting was accidental because he tripped while walking with the shotgun was "ludicrous." Based on the entire record and evidence presented to the jury, we conclude that assuming without deciding trial counsel erred in failing file motions to suppress the recorded statements as Lane claims, the failure to file the motions probably would have had no effect on the jury's verdict. *See Jackson*, 877 S.W.2d at 771.

Finally, we do not have defense counsel's explanation regarding why he did not file the motions to suppress. *See Menefield*, 363 S.W.3d at 593. On this record, we cannot conclude that the challenged conduct was so outrageous that no competent attorney would have engaged in it. *See Goodspeed*, 187 S.W.3d at 392. Issue one is overruled.

Admission of Evidence of Extraneous Acts

In issue two, Lane argues that the trial court erred when it admitted Lane's ex-wife's testimony that Lane had threatened her over Lane's objection to the testimony under Texas Rule of Evidence 404(b). Lane argues that the threat against Lane's ex-wife was a "conditional threat" and therefore not a violent act that would rebut

Lane's defense that the shooting was accidental. In issue three, Lane argues that the trial court erred when it admitted Allen's testimony that Lane had threatened him, despite Lane's objection to the testimony under Texas Rule of Evidence 404(b). According to Lane, both the ex-wife's testimony and Allen's testimony allowed the State to imply that the jury should find Lane guilty because he has exhibited a propensity for this behavior in the past. Lane argues that because of the "limited direct evidence present in this case," the admission of evidence of these extraneous acts influenced the jury's deliberations and injured Lane's substantial rights.

"'Extraneous-acts evidence is admissible if it is relevant to a fact of consequence in the case, and the probative value of the evidence is not substantially outweighed by unfair prejudice.'" *Harris v. State*, No. 09-22-00112-CR, 2023 Tex. App. LEXIS 9116, at *10 (Tex. App.—Beaumont Dec. 6, 2023, no pet.) (mem. op., not designated for publication) (quoting *Fox v. State*, 283 S.W.3d 85, 91 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd)); *see also* Tex. R. Evid. 401, 403, 404(b). "[A] trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). Under this standard, we do not reverse a trial court's decision unless it lies outside the zone of reasonable disagreement. *Dabney v. State*, 492 S.W.3d 309, 318 (Tex. Crim. App. 2016). "Furthermore, if the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it

34

will not be disturbed even if the trial judge gave the wrong reason for his right ruling." *De La Paz*, 279 S.W.3d at 344. "'If the trial court's decision on the admission of evidence is supported by the record, there is no abuse of discretion, and the trial court will not be reversed.'" *Harris*, 2023 Tex. App. LEXIS 9116, at *11 (quoting *Bradshaw v. State*, 466 S.W.3d 875, 878 (Tex. App.—Texarkana 2015, pet. ref'd))." "In determining whether the trial court abused its discretion, '[w]e may not substitute our own decision for that of the trial court.'" *Id.*

The trial court granted a pre-trial motion in limine ordering the State to approach before presenting evidence of any prior bad acts subject to Rule 404(b), and the record shows that the State complied with the motion and approached before presenting the testimony in question. The trial court ultimately admitted both Allen's and Lane's ex-wife's testimony about Lane's threats against them and, at the request of defense counsel, the trial court gave a limiting instruction for both Allen's and Lane's ex-wife's testimony. The trial court instructed the jury that it should only consider the testimony in determining intent, knowledge, absence of mistake or accident of the defendant, if any, in connection with the offense alleged against him in this case and for no other reason. In the jury charge, the judge also instructed the jury as follows:

> You are further instructed that if there is any evidence before you in this case regarding the Defendant's having engaged in conduct or acts other than the offense alleged against him in the indictment in this case, you cannot consider such evidence for any purpose unless you

35

find and believe beyond a reasonable doubt that the Defendant engaged in such conducts or acts, if any, and even then you may only consider the same in determining the motive, intent, knowledge, lack of mistake or lack of accident of the Defendant, if any, in connection with the offense, if any, alleged against him in the indictment and for no other purposes.

Lane does not complain on appeal about the limiting instructions given to the jury. We presume the jury followed the limiting instruction of the trial court. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009); *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

Rule 404(b) of the Texas Rules of Evidence provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b)(1). Rule 404(b)(2), however, provides for certain permitted uses of extraneous-offense evidence. *See* Tex. R. Evid. 404(b)(2). Specifically, the rule provides that such evidence is admissible for "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* This list is not exclusive but is illustrative. *Martin v. State*, 173 S.W.3d 463, 466 (Tex. Crim. App. 2005). "[E]xtraneous-offense evidence may be admissible when a defendant raises a defensive issue that negates one of the elements of the offense." *Id.* "Thus, a party may introduce evidence of other crimes, wrongs, or acts if such evidence logically serves to make more or less probable an elemental fact, an evidentiary fact that inferentially leads to an elemental fact, or defensive

36

evidence that undermines an elemental fact." *Id.* The prosecutor argued that Allen's testimony that Lane threatened him with a gun and Lane's ex-wife's testimony that Lane threatened to shoot her head off were relevant to show intent and to rebut Lane's defense that the shooting was accidental.

The trial court could have concluded that the extraneous offenses and the instant offense were sufficiently alike to render the extraneous-offense evidence admissible under Rule 404(b)(2). The extraneous offenses served to negate Lane's defense. We conclude the trial court's decision to admit the extraneous-offense evidence over Lane's Rule 404(b) objection was within the zone of reasonable disagreement and not an abuse of discretion. *See De La Paz*, 279 S.W.3d at 343 ("'Rule 404(b) is a rule of inclusion rather than exclusion.'").

That said, even if the trial court erred in admitting the evidence, Lane has not shown the admission of the testimony affected his substantial rights. *See* Tex. R. App. P. 44.2(b); *see also Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018) (stating that the erroneous admission of evidence is non-constitutional error). Given the other evidence before the jury, we conclude the admission of the evidence did not have a substantial and injurious effect on the jury's verdict. *See* Tex. R. App. P. 44.2(b). We overrule issues two and three.

## Cumulative Harm

In issue four, Lane argues the errors asserted in his first three issues "in the aggregate[]" caused him cumulative harm and adversely affected his substantial rights, thereby entitling him to a new trial. Lane, citing to *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999), states in his appellate brief that "[t]he Court of Criminal Appeals has acknowledged the cumulative effect of multiple errors, in the aggregate, may constitute reversible error." However, the Court of Criminal Appeals in *Chamberlain* explained that while "[i]t is conceivable that a number of errors may be found harmful in their cumulative effect[,] . . . we are aware of no authority holding that non-errors may in their cumulative effect cause error." *Id.* (internal citation omitted). Because we have overruled Lane's other issues on appeal, we overrule Lane's fourth issue. *See id.*

Having overruled Appellant's issues on appeal, we affirm the trial court's judgment.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on February 13, 2024
Opinion Delivered May 15, 2024
Do Not Publish

Before Golemon, C.J., Horton and Johnson, JJ.

38